IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JUL 10 2015

ARTHUR JOHNSTON
BY_____ DEPUTY

| | | |
|---|---|---|
| DOUGLAS HANDSHOE | ) | PLAINTIFF |
| | ) | |
| v. | ) | CIVIL ACTION NO.1:15-cv-113-KS-RHW |
| | ) | |
| TORSTAR CORPORATION (DBA | ) | |
| TORONTO STAR NEWSPAPERS LTD.) | ) | DEFENDANTS |
| PETER EDWARDS | ) | |

**REBUTTAL MEMORANDUM OF LAW IN OPPOSITION OF MOTION
TO DISMISS DEFENDANTS PURSUANT TO FEDERAL RULES OF CIVIL
PROCEDURE 12(b)(2) AND 12(b)(6)**

Plaintiff's Complaint against Defendants adequately asserts personal jurisdiction under the two prong test and claims upon which a United States Court in Mississippi could grant relief for the following reasons:

### PARTIAL FACTUAL RECITATION

1.  On or about May 20, 2002, a company named Nova Scotia Enterprises, LLC (NSE) was formed in Louisiana by Roy D'Aquila, Bennett Powell, James E. Smith, Aaron Broussard and others whose identities are still not fully known to Plaintiff. Nova Scotia Enterprises, LLC was a Louisiana holding company whose stated purpose was to own and hold certain pieces of real property located at the Trout Point Resort near East Kemptville Nova Scotia. However, Nova Scotia Enterprises LLC never owned any real property or anything of value in Nova Scotia.

2.  From 2002 through 2010, there were up to twelve (12) partners in Nova Scotia Enterprises including defendant Broussard, Broussard's ex-wife Karen Parker, Roy D'Aquila, James E. Smith, Bennett Powell and others, whose identities are still not fully known to Plaintiff.

Many of the partners Plaintiff has identified did substantial business with the Parish of Jefferson, where Broussard served as the duly elected Parish President.

3.   Unlike every partner except for his ex-wife, Broussard was given a 42% share of Nova Scotia Enterprises LLC in exchange for a disproportionately small capital contribution of under $800 when other partners, with much smaller ownership share contributed thousands of dollars to the criminal enterprise.

4.   From 2002 through 2010, Nova Scotia Enterprises, using money contributed to it by the Louisiana partners doing business with the Parish of Jefferson under the guise of "Trout Point Lodge lot assessments", paid the expenses of Broussard's rental properties located in Nova Scotia Canada including one known as River Bend Lodge, which was owned by Aaron Broussard personally. Broussard never claimed ownership of this rental property on his official annual Louisiana Ethics report filings in direct violation of Louisiana law.

5.   At all time periods from 2002 through 2010 River Bend Lodge, located at the Trout Point Lodge Resort, was owned by Aaron Broussard personally and managed by Trout Point Lodge, Limited of Nova Scotia via its owners Charles Leary, Vaughn Perret and Daniel Abel as a property that was both a part of and indistinguishable from the main Lodge itself. However, financial transactions for River Bend Lodge, as well as other Broussard properties that were facilitated by Leary, Perret and Trout Point Lodge Ltd as Broussard's agents were conducted by Leary and Perret in the name of Nova Scotia Enterprises LLC, despite the fact Nova Scotia Enterprises LLC was never registered or authorized to conduct business in Canada nor did it ever own anything of value in Canada.  River Bend Lodge's operations were funded by the NSE partners other than Aaron Broussard as part of a corrupt bribery scheme facilitated by sham financial transactions conducted in Canada by Leary, Perret, Abel and Trout Point Lodge.

2

6.  In September, 2009, news reports surfaced involving St John the Baptist Parish President Bill Hubbard taking bribes from certain venders which did business with St John the Baptist Parish.

7.  From September 2009 through December 2009 news reports connected certain high level employees of the Parish of Jefferson to corrupt bribery schemes involving the selling of medical insurance to employees of the Parish of Jefferson.   The employees identified in media reports were Aaron Broussard's Parish Attorney Tom Wilkinson and his Chief Administrative Officer Tim Whitmer.

8.  On or about January 6, 2010, the New Orleans Times Picayune published a story linking Aaron Broussard to a pay to play scheme involving Parish of Jefferson venders and his properties at the Resort at Trout Point Nova Scotia that were managed by Leary, Perret and Abel.

9.  On or about January 7, 2010, Louisiana Media Company, LLC aka WVUE Fox 8 New Orleans published an interview between investigative reporter Val Bracy and Aaron Broussard wherein Broussard addressed the allegations surrounding Jefferson Parish government venders bribing Broussard via use of his Nova Scotia properties.

10.  Broussard resigned from public office January 8, 2010 less than 12 hours after excerpts of his interview about his Nova Scotia properties aired on the late Louisiana Media Company LLC newscast in New Orleans.

11.  In April 2010, in a practice known as libel tourism, Broussard, using his business agents Leary, Perret, Abel and Trout Point Lodge, filed a defamation suit against The New Orleans Times Picayune in Nova Scotia Canada.

3

12.  On April 30, 2010, in a practice known as libel tourism, Broussard, using his business agents Leary, Perret, Abel and Trout Point Lodge, filed a defamation suit against Louisiana Media in Nova Scotia Canada.

13.  Defamation lawsuits used to silence public inquiry into public issues are also known as Strategic Lawsuits against Public Participation (SLAPP).

14.  Leary, Perret, Abel and Trout Point Lodge used their business relationship as Broussard's business agent and financial intermediary as the centerpiece of their damages arising from their Canadian SLAPP suit against Louisiana Media Company, LLC.  In that Canadian civil suit, Leary, Perret and Trout Point Lodge Ltd. claimed in sworn affidavits that Nova Scotia Enterprises LLC owned River Bend Lodge, despite the fact Leary and Perret had personally, previously purchased this property from Broussard in his personal capacity just months before in December, 2010.

15.  Leary, Perret, Abel, Roy D'Aquila, Bennett Powell and other participants to the Broussard bribery scheme submitted sworn affidavits to the Nova Scotia lawsuit against Louisiana Media Company from September, 2010 through October, 2011 which detailed the sham financial transactions they conducted as part of the Nova Scotia Enterprises LLC bribery and money laundering scheme.

16. Unknown to plaintiff at the time, more than a year into subject litigation with Louisiana Media Company, LLC on April 26, 2011 Charles Leary, on behalf of Vaugh Perret and Trout Point Lodge, filed a motion with the Supreme Court of Nova Scotia asking for a court order to obtain IP addresses and email addresses of five United States Citizens including Plaintiff, sole owner and publisher of Slabbed New Media, LLC, the owner of the website www.slabbed.org. Despite having no connection to Louisiana Media Company, LLC and in spite of the fact that

Leary, Perret, Abel and Broussard demonstrably clearly knew Plaintiff's identity, Leary fraudulently claimed in the Trout Point Motion and Affidavit to the Canadian court that he did not know any of the identities of the parties that he claimed had defamed him and his business.[1] He also falsely claimed Slabbed New Media was owned by Louisiana Media Company LLC. Using the fraudulent motion and perjured affidavit, Leary induced Canadian Justice Pierre L Muise to grant his motion and Muise[2] issued an order dated May 20, 2011 directed to Plaintiff's webhost to release the confidential information.

17. After obtaining Plaintiff's IP address and those of 4 other United States citizens using the wires, interstate and international mail and courier services along with means and process that remain only partially known to Plaintiff at this time, Charles Leary, acting on behalf of Trout Point Lodge Limited and Nova Scotia Enterprises LLC in concert with Mssrs. Perret, Abel, and Broussard filed more motions for orders to United States internet service providers such as Cox Communications and AT&T Mobility. Justice Muise issued an additional court order dated July 21, 2011 based upon Leary's and Perret's additional fraudulent affidavits and motions.[3]

---

[1] Leary's nonsensical claims of homophobia against commenter Telemachus including claiming the Southern colloquial expression "There is a snake in the woodpile" was somehow an old English homophobic slur.

[2] Muise was fatality conflicted in each of the various Trout Point Lodge Canadian defamation actions that he heard because prior to becoming a Provincial Judge, he worked for Patricia Caldwell, Q.C., and actually prepared the deeds for the properties at Trout Point development, the ownership of which was literally the core subject of the numerous defamation actions filed by Leary and Perret in Canada. Muise never disclosed this massive judicial conflict to the defendant in the Louisiana Media case. The Trout Point Group felt sufficiently close to Muise to directly email their pleadings directly to him.

[3] Abel was identified by Leary in that sequence of Nova Scotia court filings as Trout Point Lodge's US based lawyer. At the same time of those Canadian legal filings Abel was practicing law with Aaron Broussard out of Suite 106 of the Super 8 Motel in a partnership they self-styled "Aaron F. Broussard, Daniel G. Abel, Attorneys at Law"

18. On May 6, 2011 Chris Yount, a process server and private investigator closely associated with Abel, Leary and Perret served an undated Nova Scotia "Notice of Intended Action" drafted by Leary, Perret and Trout Point upon Plaintiff's spouse in Bay St Louis, Mississippi.

19. In August and September 2011, Broussard, using Leary, Perret, Abel and Trout Point Lodge as his agents, filed the first of three Nova Scotia based Defamation against Plaintiff, literally constructing large portions of their wild claims from whole cloth.[4]

20. On December 2, 2011, a Federal Grand Jury indicted Aaron Broussard for Payroll Fraud in connection with his tenure as President of the Parish of Jefferson.

21. In January, 2012, Plaintiff obtained Pleadings, Affidavits and Motions filed by Leary, Perret, Abel and Trout Point Lodge in their defamation SLAPP suit against Louisiana Media Company, LLC, which illustrated the use of their financial relationships of  Nova Scotia Enterprises, LLC, as the heart of their damages claim against Louisiana Media Company, LLC in 2010 and 2011.  Plaintiff published these affidavits, motions and pleadings to the Slabbed New Media website in January and February, 2012.  Defendants Leary, Perret, Abel and Trout Point Lodge hastily settled their suit against Louisiana Media Company after the publication of these documents in February, 2012.[5][6]

---

[4] For instance, despite having previously obtained the IP address for five US citizens commenting on a local corruption scandal on the Slabbed New Media website, Leary and Perret claimed in their amended statement of claim that instant Plaintiff simultaneously wrote all of the posts to the Slabbed New Media website and was also the author of every comment to the website.  The web of lies and deceit by Leary, Perret and Trout Point is painfully obvious to seemingly everyone save the Canadian main stream media and the Canadian judiciary.

[5] Not a single Canadian media outlet bothered to actually examine any of the documents the Trout Point Group was filing with the Canadian courts before labeling the American coverage of this New Orleans metro area corruption scandal as some sort of twisted campaign of homophobia against 2 gay men that were somehow simply minding their own business in Nova Scotia.

22. In May, 2012, Plaintiff was contacted by Special Agent Talarah Cataldi of the New Orleans office of the Federal Bureau of Investigation. Special Agent Cataldi met with Plaintiff on May 30, 2012. Special Agent Cataldi asked Plaintiff to provide the FBI with any unpublished portions of the Canadian case record obtained by Plaintiff from the Louisiana Media Suit in Canada which mentioned Nova Scotia Enterprises, LLC. Plaintiff fully cooperated with the FBI.

23. On July 25, 2012, upon filing of an affidavit sworn by defendant Leary in the United States District Court civil action styled Trout Point Lodge Ltd, Vaughn Perret and Charles Leary v Doug K. Handshoe, Plaintiff was able to ascertain that he was entitled to due process notice to the hearings held in Yarmouth Nova Scotia pursuant to the Leary/Trout Point Motions and Affidavits of April, May, June and July 2011, as defendant Leary swore in an affidavit a U. S. Court filing that he clearly knew plaintiff's identity (prior to filing the Canadian motions), despite swearing affidavits in Canada in the Louisiana Media suit where he claimed that he did not know the identity of the publisher of Slabbed.[7]

24. On August 31, 2012, the United States Department of Justice filed, Government's Notice of Intent to Introduce Intrinsic Evidence, or Alternatively, Notice of "Other Act" Evidence pursuant to Rule 404(b) of the Federal Rules of Evidence in the criminal case styled United States of America v Aaron Broussard. In this Motion, United States Prosecutors identified Nova Scotia Enterprises, LLC as a Broussard bribery scheme.

---

[6] Broussard's attorney and NSE business partner Roy D'Aquila died of a heart attack within a week of the publication of these damning Canadian court documents to the Slabbed New Media website, which upon knowledge and belief, resulted in the FBI executing search warrants at the D'Aquila's law firm. Leary and Perret would blame instant Plaintiff in a Canadian Court for D'Aquila's death.

[7] The campaign of fraud perpetrated upon the Canadian Court by Perret and Leary is the reason the Notice of Intended Action drafted by Leary, Perret and Trout Point Lodge referenced in paragraph 18 was not dated as they were attempting to conceal their actual knowledge of Plaintiff's identity from the Canadian Courts.

25. On December 4, 2012, during the pendency of their first action against Plaintiff in United States District Court seeking enforcement of their first Canadian defamation judgment, defendants filed another defamation suit in Canada against plaintiff and plaintiff's webhost Automattic, alleging a massive homophobic conspiracy against them which included plaintiff, plaintiff's lawyer Jack E. "Bobby" Truitt among others.

26. The purpose of this suit was to force defendant Automattic to terminate a long standing hosting agreement between it and Plaintiff.

27. On December 17, 2012 Automattic terminated its hosting agreement with Slabbed New Media and removed from their servers all of Slabbed New Media's files.

28. On December 19, 2012, a Canadian lawyer acting at the behest of Leary, Perret, Abel and Trout Point Lodge filed a takedown notice with another of Plaintiff's web host objecting to a picture of defendants Leary, Perret and Abel that was posted to the Slabbed New Media website. In accordance with the requirements of the Digital Millennium Copyright Act (DMCA) web host New Dream Networks disabled the photo in question. In accordance with the DMCA, Plaintiff submitted a counter notification, which starts a process whereby the complainant can file for an injunction in the United States District Court for the Southern District of Mississippi. Neither the Canadian lawyer asserting the copyright claims nor Leary and Perret ever filed for an injunction with the US District Court. The image was subsequently restored by Plaintiff in accordance with the DMCA.

29. On December 31, 2012, defendant Leary filed two additional DMCA takedown notices against the Slabbed website. Again in accordance with the DMCA, Plaintiff submitted a counter notification and removed the images while the applicable statutory time period ran for defendant

Leary to file for an injunction with the United States District Court for the Southern District of Mississippi. Again defendant Leary failed to file for an injunction and the images were restored.

30. At a date unknown in January, 2013 Leary, Perret and Trout Point Lodge Limited amended their December 2012 lawsuit, dropping plaintiff as a defendant in the action, replacing their allegations against Automattic of defamation with a breach of contract suit, said contract being the deletion of the Slabbed New Media LLC website previously hosted by Automattic.

31. On January 16, 2013 Daniel Abel filed a defamation suit against plaintiff and Jefferson Parish Corruption whistleblower Anne Marie Vandenweghe in the Louisiana Eastern District United States District Court. This lawsuit recycled many of the allegations from Leary and Perret first Canadian defamation suit.

32. On February 4, 2013 Leary and Perret, in collusion with Broussard, Abel and Yount, served upon Plaintiff a civil suit filed in Nova Scotia seeking relief under the US Digital Millennium Copyright Act which accusing plaintiff of "submitting bogus counter notifications". This suit sought a Canadian injunction.[8]

33. On March 19, 2013, Abel willfully supplemented a federal court pleading with information Charles Leary fraudulently obtained via Canadian court order obtained as specified in paragraphs 16 and 18.

34. On May 13, 2013, Abel, after multiplying the United States District Court proceeding with frivolous brief after frivolous brief which contained a multitude of defamatory allegations levied against plaintiff Handshoe and his codefendant in that action Anne Marie Vandenweghe, voluntarily dropped his suit on the day before a hearing to strike his defamation claims under Louisiana's Anti SLAPP statute.

---

[8] The Canadian Copyright Act has does not use the U.S. DMCA takedown and counter-notification procedures.

35. On May 27, 2013, Defendant Abel refiled his US District Court defamation lawsuit in the New Orleans Civil District Court including as co-defendants all of Plaintiff Handshoe's previous lawyers, four total, plus the Baldwin Haspel law firm.

36. On September 5, 2013 the United States Fifth Circuit Court of Appeals denied comity of the first Trout Point Nova Scotia defamation suit filed against Plaintiff under the United States SPEECH Act.  Regarding the Canadian Injunction obtained by the Trout Point Group in that first Nova Scotia defamation suit, Judge Jennifer Elrod, writing for the court noted, "the Nova Scotia Court entered a permanent injunction against Handshoe, "restraining him from disseminating, posting on the Internet or publishing, in any manner whatsoever, directly or indirectly, any statements about the plaintiffs, Trout Point Lodge, Charles L. Leary, and [Vaughn] J. Perret." The injunction included "publication, circulation and promotion on the blog named Slabbed, and any similar or other publications." The court added, for "further particularity," that Handshoe "shall not publish or cause to be published or otherwise disseminate or distribute in any manner whatsoever . . . any statements or other communications which refer to the plaintiffs by name, depiction or description." It ordered Handshoe to immediately remove any such material from publication. **Trout Point does not seek to enforce the injunction in this action. Rightly so, as the injunction does not comport with even the most basic protections against prior restraints on speech in the United States.**" (Emphasis added)

37. Beginning on or about February 14, 2014 the Defendants Leary and Perret on behalf of the Trout Point Criminal Enterprise, began serving the Canadian Injunction for which they had previously represented to the United States courts they were not seeking to enforce yet for which the court previously specifically denied comity, on Plaintiff's United States based Interactive

Internet Service Providers along with Digital Millennium Copyright Act Takedown notices as follows:

• On February 15, 2014 to YouTube wherein the Trout Point claimed ownership of a parody created and owned by Slabbed New Media, LLC.

• February 18, 2014 to New Dream Network in which defendants claimed ownership over parodies created by third parties unconnected to the Lodge which were published to the Slabbed new Media website with the express consent of the creators of the works in question.

• On April 1, 2014 to HostGator, LLC claiming ownership over creative works created by Frank Magazine that were republished to the Slabbed New media website with the permission of Frank Magazine.

38. On March 14, 2014, using the legal services of Trout Point owner Daniel Abel, Leary, Perret and Trout Point filed a malpractice suit against their lawyer Henry Laird related to their first failed attempt to gain comity in the United States for their fraudulently obtained first Nova Scotia defamation judgment against instant Plaintiff in the New Orleans Civil District Court, a venue with no connection to the underlying representation of Trout Point provided in Mississippi by Laird.  At the time this meritless lawsuit was filed, Leary, Perret and Trout Point owed Laird and his firm Jones Walker $97,000 in unpaid legal fees related to his multi-year representation of their interests before this honorable United States District Court.[9]

39. On November 6, 2014, Trout Point Lodge owner Danny Abel was suspended from the practice of law pending permanent disbarment for threat of harm to the public. Abel's history, habit and practice of filing meritless lawsuits against opposing counsel, sitting judges, court

---

[9] This lawsuit was dismissed on September 5, 2014 by the New Orleans court.

employees along with Louisiana State officials such as Louisiana Attorney General Buddy Caldwell as well as a documented history of multiple court sanctions for filing frivolous, vexatious litigation and appeals precipitated the disciplinary action.[10]

## FACTUAL BACKGROUND

In late 2009 and early 2010 the beginnings of what would turn into a massive political corruption scandal surfaced in media reports involving Jefferson and St John the Baptist Parish governments, both located in the New Orleans metropolitan area.  At their heart both public corruption scandals shared the commonality of certain public officials profiting from private business relationships with the Parishes they were elected to serve. In addition high ranking Jefferson Parish employees did substantial business selling insurance to St John the Baptist Parish public employees via no-bid RFPs administered by the Hubbard administration. Parish President Broussard and his Parish council in turn steered millions in post Hurricane Katrina infrastructure rebuilding contracts to a company owned by Hubbard.[11]  The fact pattern from the public record then strongly suggested multiple quid pro quo arrangements of questionable legality between the two neighboring Parishes. As the scandal unfolded into multiple, distinct self-enrichment schemes involving numerous politically connected persons and elected officials including a sitting Louisiana state court judge[12], Slabbed New Media covered certain of the

---

[10] Abel has also been suspended by the Louisiana Federal Courts for the same reason.

[11] See *Bill Hubbard abused his position as St. John the Baptist Parish president, judge says.* The New Orleans Times Picayune, January 20, 2011 at http://www.nola.com/crime/index.ssf/2011/01/judge_to_hubbard_you_abused_yo.html

[12] See *Jefferson Parish's red light camera program is snaring more than heavy-footed pedestrians – and the feds have the subpoenas to prove it.* The Jefferson Report, March 23, 2010 reprinted at meetup.com http://www.meetup.com/camerafraud/messages/boards/thread/6814493#34674984 and *Red light cameras under attack in Jefferson Parish*, The New Orleans Times Picayune, January 26, 2010 at ´ http://www.nola.com/politics/index.ssf/2010/01/red_light_cameras_under_attack.html

Broussard self-enrichment schemes on its website that did not involve Broussard's corrupt Nova Scotia bribery and money laundering scheme, earning the fledgling media company peer recognition from established local media outlets including the Times Picayune.[13] [14]

However, Slabbed's first story on the unfolding corruption scandal highlighted the website of the Billy Hills Trails Society, an organization that was created by the Trout Point Group. This website listed Aaron Broussard as an officer of the organization along with Leary and Perret. This website was disabled by Leary and Perret within 60 minutes of the original publication to the Slabbed New Media website in January, 2010. This post also somehow was incorporated years after the fact into the new allegations of defamation levied by the Trout Point Group in the third Canadian SLAPP suit in 2013 which underlies this instant action.

On February 16, 2011 at 4:21 pm Slabbed commenter Telemachus excerpted from the January 10, 2010 story on Broussard's activities at Trout Point which was later retracted by the Times Picayune.[15] This comment read in part:

> You can take a fishing pole and catch a trout in your front yard," Ed Muniz recalled Aaron Broussard telling him in 1998 about a real estate investment opportunity in Nova Scotia, Canada.
>
> The subject, Muniz said, was Trout Point Lodge, a four-hour's drive from Halifax and deep in the pristine forest of a provincially protected wilderness area. Both

---

[13] Those topics would include the Redflex Red Light Camera scandal along with the no-bid award of the Parish's landfill contract to the politically connected group which owns the River Birch Landfill. Redflex, after filing SLAPP suits in both Australia and the US to silence reporting on its questionable business practices ended up having executives plead guilty to numerous bribery schemes including the City of Chicago (December 2014) and Northern Ohio (June 2015).

[14] One of Slabbed New Media's stories on the presidential drill moratorium litigation surrounding the 2010 Gulf of Mexico Oil Spill crossed over into the national media during this same time period.

[15] The SPEECH Act of 2010 has not passed Congress when the events surrounding the Times Picayune defamation suit in Nova Scotia occurred.

men were serving on the Jefferson Parish Council at the time, and Muniz said Broussard asked him to buy into the development: $25,000 for a 2 percent stake.

The Metropolitan Crime Commission on Wednesday asked for a state ethics investigation into whether Broussard had been renting Nova Scotia vacation property to Jefferson Parish contractors. Two days later, Broussard resigned as parish president, citing the distractions of the widening federal criminal investigation into his administration.

The investigation began with subpoenas related to the private insurance business of Broussard's former chief administrator, Tim Whitmer, who resigned Monday. Federal authorities also have subpoenaed records regarding River Birch Inc., which owns a Waggaman landfill and signed a deal in June to be the sole garbage dump for Jefferson Parish for the next 25 years.

Charles Leary, managing director of the lodge, e-mailed The Times-Picayune on Friday saying Broussard "does not and has never had any ownership or management involvement with Trout Point Lodge Limited." The message went on to say Broussard owns a "vacation home on the same road."

But the familiar names of some of the investors shed some light on the political lattice of Jefferson Parish. They include Bennett Powell, who said last week he bought a small share in the lodge similar to the one described by Muniz, and Larry Stoulig, who is listed as a partner in Broussard's management company and who said other investors bought him out five years ago. The late Marie Krantz, former owner of the Fair Grounds and Jefferson Downs race tracks, and Nick Baroni, a Kenner City Council member while Broussard was mayor there, also invested in developing property near the lodge, Baroni said."

"Baroni and Stoulig have served time in federal prison on fraud charges in separate incidents unrelated to the Nova Scotia investments. The link between Nova Scotia and southern Louisiana, outside of the historical link of Acadian culture, seems to have begun with Daniel Abel, a lawyer who made a name for himself in 1999 working with the late attorney Wendell Gauthier to sue gun manufacturers for violence in New Orleans. Muniz said Abel served as Broussard's legislative aide when he was on the Jefferson Parish Council.

"But Louisiana secretary of state records and documents provided by Muniz show that in 1997, Abel, Charles Leary and Vaughn Perret formed a Louisiana corporation called La Ferme Ltd. and its Canadian counterpart, La Ferme d'Acadie. The three soon opened the Trout Point Lodge, according to a 2001 travel story in The Times-Picayune.

After investing in the lodge, Muniz said he turned down a second offer from Broussard, in 1999, to buy nearby property. Having yet to see a financial report about the lodge, Muniz said he demurred on the new opportunity.

On April 18, 2011, at the behest of Leary and Perret, Advance Publications, owner of the Times Picayune filed a DMCA takedown notice involving the Telemachus comment with Slabbed New Media's webhost. Slabbed New Media removed the comment in question in accordance with the provisions of the DMCA. It also piqued instant plaintiff's interest as to why such a seemingly innocuous news account of Broussard's Canadian activities could be construed as defamatory toward Abel, Leary and Perret drawing the attention of publisher Handshoe in the process. Slabbed New Media had never previously contemplated the importance of the original Times Picayune story on what we now know as Aaron Broussard's Canadian bribery and money laundering scheme.

Enraged that their previous cover-up attempts had failed after Slabbed New Media began investigating these allegations in Mississippi and Louisiana, the Trout Point Group was soon filing motions directly with the chambers of Nova Scotia Justice Pierre Muise involving the Slabbed New Media website.  These motions which relied on perjured affidavits claiming the Trout Point Group had no knowledge of instant plaintiff's true identity as detailed in paragraphs 16 through 18 of the partial factual recitation contained in this rebuttal memorandum sought the identities of five commenters to the Slabbed New Media website. Hindsight reveals the very publications which Leary and Perret complained so bitterly about in a Canadian courtroom were the ones which mentioned "River Bend Lodge" and/or Nova Scotia Enterprises.   Slabbed New Media (and the American public) would later learn via Leary's own affidavits that he submitted in the Louisiana Media Canadian defamation SLAPP suit that this River Bend property, which Leary falsely claimed was owned by the Louisiana domiciled Nova Scotia Enterprises LLC, was actually a front for a United States bribery scheme that Broussard owned personally.

Through time the only consistency involving the explanations given by the Trout Point Group of their involvement with Broussard's illicit rental activities lay in its inconsistency. In January, 2010 in communications to the Times Picayune authored by Charles Leary, Broussard was supposedly simply someone with a vacation house down the road from Trout Point with no connection to the Lodge whatsoever. By January 16, 2012 in a blog post to the Trout Point Lodge blog that is now deleted, Leary and Perret admitted the Lodge managed Broussard's rentals, which stood in contradiction to the claims that the Trout Point Group was making in the Louisiana Media case during that same time period where the Trout Point Group claimed Nova Scotia Enterprises owned the River Bend Lodge, rather than Aaron Broussard personally. Trout Point also claimed the interruption of their lucrative business relationship with Nova Scotia Enterprises was caused by the January 2010 Fox 8 Interview of Broussard and reporting done by Val Bracy on the subject of Broussard's Canadian property holdings as reported to the Louisiana Ethics Administration. The publication of these Trout Point affidavits circa 2010 and 2011 from the Louisiana Media Canadian SLAPP suit to the Slabbed New Media website in late January, 2012 stood in stark contrast to the earlier blog post, dated January 16, 2012 on the Trout Point Lodge Blog, where Trout Point Group admitted "The Lodge also managed rentals of his [Broussard's] property, and has never denied this fact".

By September 2012 the Trout Point Group's web of lies and deceit collapsed with the US Attorney motion in the criminal case styled USA v Broussard which revealed Nova Scotia Enterprises was an Aaron Broussard bribery scheme. Enraged at being exposed as crooks and charlatans by Slabbed New Media, LLC, Abel, Leary and Perret have since engaged in misguided legal jihad against Instant Plaintiff along with the lawyers that have previously represented him that literally continues to this day all while certain elements of the Canadian

media, including the instant Defendants, act the part of cheerleader to the attempted cover-up of a United States criminal conspiracy.

These are unindicted criminal co-conspirators of Aaron Broussard that the Toronto Star and Peter Edwards champion. Miscreants all that have been more properly described by less lazy, more observant Canada media outlets as "Enemies of the free press".[16] [17]

Defendants Torstar and Edwards filed a Motion under Fed. Rules Civ. Proc. 12(b)(2) (Lack of Jurisdiction) and/or 12(b)(6) (Failure to State a Claim) to dismiss this case.  Plaintiff rebuts each in turn.

**LACK OF PERSONAL JURISDICTION**

The limitations on the reach of the personal jurisdiction of a Mississippi court is well laid out in *Allred v. Moore & Peterson* 117 F.3d 278 (5th Cir. 1997):

> The exercise of personal jurisdiction over a nonresident defendant comports with due process principles only when two requirements are met. First, the nonresident defendant must have "purposefully availed himself of the benefits and protections of the forum state by establishing `minimum contacts' with that forum state."
> *Felch v. Transportes Lar-Mex, Sa De CV*, 92 F.3d 320,323 (5th Cir. 1996) (citing *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir.), cert. denied, 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994); *International Shoe Co. v. Washington*, 326 U.S. 310, 315-17,66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)); *Burger King Corp. v.*

---

[16] The Rick Howe show, News 95.7FM radio, Halifax Nova Scotia, January 8, 2015 in an interview with Andrew Douglas, Publisher of Frank Magazine in the aftermath of the Charlie Hebdo massacre in Paris France.

[17] Leary, Perret and Abel's cynical use of their homosexuality as cover for their criminal activity is not only the epitome of personal cowardice but also represents a figurative slap in the face to every gay or lesbian that actually suffered physical harm as a result of their sexual orientation.

*Rudzewicz*,471 U.S. 462, 475-77, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). Second, the exercise of personal jurisdiction over the nonresident defendant "must not `offend "traditional notions of fair play and substantial justice."'" Felch, 92 F.3d at 323 (quoting Wilson,20 F.3d at 647; Asahi Metal *286286 Indus. Co. v. Superior Court of California, 480 U.S. 102, 113-15,107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987)).

The `minimum contacts' portion of the inquiry is further subdivided into the kind of contacts that give rise to "specific" personal jurisdiction and those that give rise to "general" personal jurisdiction. Specific jurisdiction is appropriate when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action.

If a nonresident defendant has sufficient minimum contacts with the forum state the fairness of the exercise of personal jurisdiction by the Mississippi court is then evaluated. Again quoting *Allred v. Moore & Peterson* 117 F.3d 278 (5th Cir. 1997):

"The fairness prong for personal jurisdiction requires federal courts to consider (1) the burden upon the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in securing relief; (4) `the interstate judicial system's interest in obtaining the most efficient resolution of controversies'; (5) `the shared interest of the several States in furthering fundamental substantive social policies.'" *Bullion v. Gillespie*, 895 F.2d 213, 216 n. 5 (5th Cir. 1990) (citing *Asahi*, 480 U.S. at 113-15, 107 S.Ct. at 1033 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 288-90, 100 S.Ct. 559, 563,62 L.Ed.2d 490 (1980)))

Plaintiff contends the defamation torts alleged subject Defendants to the specific personal jurisdiction of this Honorable Court as substantial parts of the underlying sequence of events leading to injury causing damages included substantial events which occurred in or were purposely directed at the State of Mississippi.

### Minimum Contacts

*International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), first set forth a minimum contacts test as a way to establish jurisdiction over a defendant that is not physically present in the state. The *International Shoe* Court recognized that a court's ability to exercise personal jurisdiction over a defendant historically required the defendant to be physically present in the forum. In analyzing the physical presence concept, the Court in *International Shoe* determined that a nonresident who had a random contact with the forum state should not be haled into court there on a matter unrelated to that contact, yet the absence of physical presence should not defeat jurisdiction for actions directed at the forum state. While maintaining a physical presence is not irrelevant to jurisdictional analysis, it is not necessarily determinative of it either.

In cases involving intentional torts, *Calder v. Jones*, 465 U.S. 783 (1984) gave rise to an expansion of the minimum contacts inquiry. The Calder "effects test" recognizes that a defendant need not ever have been physically present in the forum state to be subject to the personal jurisdiction of the courts located there.

The Calder effects test represents an additional way for establishing personal jurisdiction over a nonresident defendant who may never have been to the forum state. In *Allred v. Moore Peterson*, 117 F.3d 278, 287 (5th Cir. 1997), the court found that the "[K]ey to Calder is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's

relevant contacts with the forum. Whether these effects, either alone or in combination with other contacts, are sufficient to support in personam jurisdiction will turn upon the particular facts of each case." (*Wallace v. Herron*, 778 F.2d 391, 395 (7th Cir. 1985)). Simply stated, *Calder* allows a court to find that a nonresident defendant who intentionally aims his or her tortious conduct at the forum state has established minimum contacts with the forum, even if the defendant has not established a physical presence there.[18]

In *Calder*, the Supreme Court found that when an alleged tort-feasor's intentional actions are expressly aimed at the forum state, and the tort-feasor knows that the brunt of the injury will be felt by a particular resident in the forum, then the tort-feasor must reasonably anticipate being haled into court there to answer for its tortious actions. This holds true even if the tort-feasor's conduct occurs in a state other than the forum state.[19]

To support personal jurisdiction against a defaming defendant, the Fifth Circuit has emphasized Calder's requirement that the forum "be the focal point of the story."[20] For instance, in *Revell v. Lidov*, 317 F.3d 467, the plaintiff sued a non-resident defendant in Texas after the defendant alleged on a Columbia University website that the plaintiff had advance knowledge of

---

[18] *Mullins v. Test America, Inc.*, 564 F.3d 386,402 (5th Cir. 2009)

[19] See *Southmark Corp. v. Life Investors, Inc.*,851 F.2d 763, 772 (5th Cir. 1988) ("In Calder, the Supreme Court held that when an alleged tort-feasor's intentional actions are expressly aimed at the forum state, and the tort-feasor knows that the brunt of the injury will be felt by a particular resident in the forum, the tort-feasor must reasonably anticipate being haled into court there to answer for its tortious actions."); *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 *386386 (5th Cir. 1999) ("Even an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct."); *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 333 (5th Cir. 1982) (holding that specific personal jurisdiction existed in defamation action even though the non-resident defendant was not present in the forum state, but concluding that, "[i]f, as is alleged in this case, [the defendant] causes injury in [the forum state], he is covered by the [long-arm] statute").

[20] *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482

the bombing of Pan Am Flight 103. Although the *Revell* court recognized that the plaintiff suffered emotional distress and damage to his professional reputation in Texas, it also concluded that the alleged defamatory statements were inadequately directed to Texas to satisfy minimum contacts under *Calder*. The Fifth Circuit has consistently held that, to exercise specific jurisdiction in a libel action, the "aim" of the plaintiff under the Calder test must be demonstrated by showing that (1) the subject matter of and (2) the sources relied upon for the article were in the forum state.[21]

In this case is clear that the requirements of Calder are satisfied. The Defendants took the proactive step of contacting both Plaintiff in Mississippi and his lawyer in Louisiana, using them as sources for the publication in question. It is also unquestioned the focus of the article involved events that predominately occurred in the State of Mississippi as the story includes statements of fact such as "homophobic Internet smear campaign from a Mississippi blogger", "Handshoe also peppered his blog postings with anti-gay smears", "American courts refused to compel Handshoe to pay the damages". Worth noting is that the Slabbed New Media reporting on the Trout Point Group's intimate involvement in one of Aaron Broussard's corrupt bribery and money laundering schemes had substantially its entire focus reporting on subject matter to these numerous, meritless SLAPP suits which lie in the New Orleans Metropolitan area.[22]

Finally, it is Torstar's own readers that give us the clearest evidence as to where the defamatory publication was aimed. While it is true the Torstar publishes its newspaper in Canada, the readers of the story by their very actions betray exactly where the smear piece was

[21] *Revell v Lidov*, 317 F.3d at 474 n. 48 (citing Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1120 (6th Cir. 1994))

[22] Hancock and Pearl River Counties Mississippi are actually part of the New Orleans media market per the Federal Communications Commission rules governing television broadcasts.

aimed. Story commenter Cheezemeister was one of many Torstar readers that proactively attempted to access instant Plantiff's website based upon the smear piece writing, "he's had Canadian IP addresses geoblocked on his site, so if you try to access it from a Canadian IP you can't." Commenter lvnv99 wrote, "If he continues blogging, as he said he was going to do, and is then stupid enough to submit to Canadian jurisdiction, I imagine he would be in contempt. But rednecks like this guy rarely leave their state, much less the United States" again showing the geographic focus of the story was aimed at Mississippi. John Willow writes (albeit falsely), "This creepy little bottom-feeder Handshoe, who believe it or not, is a lawyer and CPA, runs a blog called Slabbed. His phone number is right on it. Maybe some people should get in touch with him and let him know what they think. You can get away with anything in the U.S. Hate speech is protected because ignorant Americans can't figure out the difference between free speech and hate-mongering." These comments do not include those subsequently deleted by Torsatar employees such as the one that labeled Mississippians in general as illiterate hicks.

Finally, the targeting did not only include reader comments directed to Mississippi on the Torstar website as certain Torstar's readers purposely disseminated the Torstar smear piece to United States websites such as Crazy Days and Nights located at www.crazydaysandnights.net.[23] In a post to the website on February 24, 2014, commenter Unknown wrote the following in comments:[24]

> OT – speaking of distorting the truth...
>
> http://www.thestar.com/news/canada/2014/02/24/nova_scotia_couple_wins_laws
> uit_against_homophobic_american_blogger.html

---

[23] This website is registered via GoDaddy, domiciliary State of Arizona, USA.

[24] http://www.crazydaysandnights.net/2014/02/random-photos-part-five-98.html

> A gay couple who own a lodge has been harassed for years by a Mississippi
> accountant/blogger business and livelihood. My friends, please feel free to let this
> homophobic piece of shit what you think.
>
> > http://slabbed.org/
> > DOUGLAS K HANDSHOE CPA
> > 110 HALL ST
> > Wiggins, MS 39577
> > (601) 928-5380

The story, as illustrated by the very actions of the Torstar readers, was inherently directed to Mississippi. In contrast to *Revell* where the publication in question contained no reference to Texas, the state where the related civil suit was filed nor did it refer to the Texas activities of the plaintiff in *Revell*. Texas was simply not the focal point of the article or the harm suffered in *Revell*, unlike *Calder*, where the publication contained descriptions of the California activities of the plaintiff which was based in part upon sources located in California. The court in *Revell* drew the distinction between the cases quoting the Calder court:

> The allegedly libelous story concerned the California activities of a California
> resident. It impugned the professionalism of an entertainer whose television
> career was centered in California. The article was drawn from California sources,
> and the brunt of the harm, in terms both of respondent's emotional distress and the
> injury to her professional reputation, was suffered in California. In sum,
> California is the focal point both of the story and of the harm suffered.[25]

In this instance, it is clear the publication at controversy was written about a Mississippi businessman whose career as a practicing CPA[26] and journalist is completely centered in Mississippi, involving publications to Plaintiff's media company's website that were clearly

---

[25] *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482 at 788-89

[26] Unlike defendant Edwards, Plaintiff actually possesses recognized financial credentials including a 28 year career largely focused in the field of auditing. Professionally, Plaintiff's background has also included rendering professional services involving a major United States Racketeering case and resulting criminal forfeiture.

about a Louisiana based political corruption scandal. The Torstar story drew from Mississippi and Louisiana sources and was aimed at Mississippi based upon the affirmative actions of its own readers.  There were numerous mentions of Mississippi and Louisiana in the article. Simply put, Handshoe, especially in his personal capacity[27], had no contact with Canada whatsoever, let alone those that would subject him to the jurisdiction of a Canadian Court in Halifax Nova Scotia. The activities, including the allegations contained in the third Canadian SLAPP suit default were largely centered in Mississippi and Louisiana.

Plaintiff avers that he has established a prima facie case to satisfy the minimum contacts prong of the inquiry.

Finally, defendants claim Mississippi Code Section 95-1-5 (incorrectly cited as Section 91-1-5 by the defendants) bars this action are without support. Section 95-1-5 states:

> (1) Before any civil action is brought for publication, in a newspaper domiciled and published in this state or authorized to do business in Mississippi so as to be subject to the jurisdiction of the courts of this state, of a libel, or against any radio or television station domiciled in this state, the plaintiff shall, at least ten (10) days before instituting any such action, serve notice in writing on the defendant at its regular place of business, specifying the article, broadcast or telecast, and the statements therein, which he alleges to be false and defamatory.

The defendants are not domiciled in Mississippi nor are they authorized to conduct business in Mississippi thus this code section does not apply.  However, in the event this Honorable Court should find otherwise, there is evidence in the form of an email that Plaintiff notified Edwards/Torstar of the coming defamation suit in July 2014.  Defendant Edwards, after smearing Handshoe on behalf of a United States criminal enterprise on February 24, 2014,

---

[27] The legal record here in the US involving Perret's prior practice of law is sparse as he did not make a living practicing law in Louisiana.  However, suing someone in a personal capacity over acts involving a duly registered Limited Liability Company typically betray the actions of a legal novice devoid of any legal training rather than those of a "Park Avenue Lawyer", as Perret has self-styled his prior life as an unsuccessful trial lawyer wannabe in Louisiana.

amazingly then invited Handshoe to connect with him via LinkedIn months later on July 14, 2014.[28] [29]

### Exercising Personal Jurisdiction over Torstar and Edwards in Mississippi Does Not Offend Traditional Notions of Fair Play and Substantial Justice

In this matter, the burden upon Torstar and Edwards to litigate the case in Mississippi would not be unfair. Torstar deliberately targeted their conduct toward a Mississippi resident and business, and profited from the underlying smear campaign in doing so. Further, "Mississippi has a significant interest in redressing injuries that actually occur within the State." [30] "The dissemination of material into a state is sufficient to establish "minimum contacts" when this activity within the state allegedly injured the plaintiff. Libel occurs wherever the offending material is circulated. Defamatory statements harm both the subject of the falsehood and the reader of the falsehood." [31]  The United States Supreme Court has found that a publisher can reasonably anticipate being haled into court to defend a libel action based on the contents of its magazine in a state where it has distributed magazines. Similarly, Plaintiff has an equal, if not greater, interest in securing relief in his home state, where the brunt of the injury to his business

---

[28] Edwards was no doubt trolling for more personal information about Plaintiff on Leary and Perret's behalf.

[29] The LinkedIn invitation and Handshoe's reply to Edwards are attached as Exhibits 1 and 2. Edwards claim that he is an expert in organized crime and money laundering is dubious based on his reporting.

[30] *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790, 798-99 (1984)

[31] Id at 799.

and thus his investment therein was sustained.[32] Mississippi or Louisiana would be the only

efficient forums for resolution of this case.[33] Mississippi's substantive policy of protecting its

citizens from injury is greater than Louisiana's interest in an event involving a nonresident of that

state.

## FAILURE TO STATE A CLAIM

The legal standard to dismiss for Failure to State a Claim involving a Pro Se litigant is

well stated in *Roebuck v Dothan Security et al*, Unpublished Opinion of the United States 5th

Circuit Court of Appeals [Case No.12-60649]

> "(A)ccept all well-pleaded facts as true and viewing those facts in the light most
>
> favorable to the plaintiff." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).
>
> However, "[t]hreadbare recitals of the elements of a cause of action, supported by
>
> mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678
>
> (2009) (citation omitted). "To survive a motion to dismiss, a complaint must
>
> contain sufficient factual matter, accepted as true, to 'state a claim to relief that is
>
> plausible on its face.'" Id. (citation omitted). In the instant case, Roebuck was
>
> proceeding pro se when he filed his complaint. Although pro se complaints are
>
> held to less stringent standards than those crafted by attorneys, "conclusory
>
> allegations or legal conclusions masquerading as factual conclusions will not

---

[32] Slabbed New Media, LLC filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Mississippi on June 16, 2015 as a result of the litigation terrorism of the Trout Point Group.

[33] It is still unclear what basis the conflicted Canadian Justice Muise used to justify hearing a defamation case in Canada that had as its underlying subject matter a criminal public corruption scandal 2000 miles away in the New Orleans Metro area, which was completely underpinned by evidence submitted in the form of affidavits sworn by American Citizens from the State of Louisiana.

suffice to prevent a motion to dismiss." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (citation and internal quotation marks omitted).

In general terms Rule 12(b)(6) has been expressed as "a powerful tool in expediting the judicial process" that "should be applied cautiously and granted only on rare occasion." [34] A complaint should not to be dismissed under Rule 12(b)(6) "unless it appears to a certainty that no relief can be granted under any set of facts that can be proven in support of its allegations." [35] Additionally, the complaint is liberally construed in favor of the plaintiff and all allegations are accepted as true for purposes of a Rule 12(b)(6) motion. [36]

In this instant matter the defendants point to their article quoting a Nova Scotia Court's opinion on a default judgment as subject to privilege.  However, privilege ends once factual assertions are made that are not supported by the court record.

Whether a privilege applies is "generally a matter for the court to decide."[37]  The threshold legal issue the court examines is whether a publication constitutes a "fair and accurate" republication.[38] The publication must "conveys to the persons who read it a substantially correct account of the proceedings. Not only must the report be accurate, but it must also be fair.... It is

---

[34] *Clark v. Amoco Production Co.*, 794 F.2d 967, 970 (5th Cir.1986)

[35] *United States v. Uvalde Consol. School District*, 625 F.2d 547, 549 (5th Cir.1980); cert. denied, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981)

[36] *Kaiser Aluminum and Chemical Sales, Inc. v. Avondale Ship Yards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982), cert. denied, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983)

[37] *Pittman v. Gannett River States Publ'g Corp.*, 836 F.Supp. 377, 382 (S.D.Miss.1993)

[38] *Brocato v. Mississippi Publishers Corp.* 503 So.2d 241 (1987)

necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it."[39]

In this case it is clear that privilege does not apply as the report contained several omissions and misstatements which conveyed an erroneous impression to those that read it. First the publication in question refers to the underlying Canadian civil action as Copyright Infringement suit which is not accurate. While it is true the action began as one solely centered on Copyright matters surrounding publications and copyrights with origins in the United States, after Plaintiff briefed the manifest jurisdictional problems with a Canadian Court hearing matters related United States Copyright laws, the Trout Group amended their original complaint, increasing it from under 10 pages to over 44 pages, almost all exclusively dealing with the tort of defamation, which they claimed in a Motion to Amend and Convert was factually inseparable from their original Copyright Infringement claims. In fact, the barely incomprehensible screed accepted as a legal complaint by the Canadian courts is preambled by 12 pages of ad hominin personal attacks on Handshoe. The Trout Point Group's complaints of defamation centered on a court case in New Orleans Louisiana which named Trout Point Lodge as a racketeering co-conspirator with the River Birch Landfill in Jefferson Parish Louisiana that Plaintiff covered after it was filed in the Louisiana court for the Slabbed New Media website. Of the 200 plus paragraphs in the amended complaint[40] just 11 deal with allegations of copyright infringement, some of which were recycled by the Trout Point Group from their first defamation action against

---

[39] *Pittman v. Gannett River States Publ'g Corp.*, 836 F.Supp. 377, 382 (S.D.Miss.1993)

[40] Attached as Exhibit 3.

instant Plaintiff which was denied comity by this Honorable Court.[41] A plain read of the section of the Nova Scotia Court's opinion[42] dealing with the copyright claims show that the legal determinations of infringement were based on the Canadian jurisprudence surrounding the common law tort of defamation. To mislabel the underlying suit as a copyright matter is fundamentally misleading. Additionally, while both the Canadian Court and Torstar continually referenced the first Canadian defamation action in the opinion and news report, Torstar neglected to convey exactly why the first Trout Point SLAPP suit was not accorded comity in the United States, the foremost reason being that the Trout Point Group failed to demonstrate that Slabbed New Media published anything about the Trout Point Group that was actually false. In fact, the coverage of the Trout Point Group on the Slabbed website relies almost exclusively on their own words in the form of their various affidavits, demonstrably perjured as they were, along with Trout Point's own blog and social media postings. Nowhere in the Torstar publication does it state that Leary and Perret did not seek enforcement of the injunction which they obtained in 2012 in the United States. Nor did the Torstar article convey that the United States Fifth Circuit Court of Appeals proactively found that the Canadian injunction relied upon in the third SLAPP suit by the Canadian court did not "comport with even the most basic protections against prior restraints on speech in the United States." Finally, while it is true the Canadian Court opined that instant Plaintiff was a homophobe in a default proceeding, Torstar never so much as cited a single example of Slabbed New Media LLC or Handshoe expressing homophobic views, mainly because these claims were concocted from whole cloth by Leary, Perret and Trout Point in their first and third Canadian SLAPP suits against Plaintiff.

---

[41] Counsel for Torstar even wrote about this precedent setting case for the Mississippi Press Association titled, *"Defeating "Libel Tourism" under Mississippi law and the SPEECH Act"*, July 11, 2014.

[42] Exhibited by Defendants at ECF #5-1.

Finally, it is well worth noting that Torstar actually became an active participant in the third Canadian SLAPP suit against Handshoe in his personal capacity by assigning a copyright from their January 2012 smear publication about Plaintiff to Leary and Perret, during the pendency of the 2013 litigation, for the express purpose of enabling Leary and Perret to allege an after the fact copyright claim against Plaintiff. Neither Torstar nor Edwards disclosed this vital contextual fact in the February 24, 2014 publication on the civil default.  It is a certainty that the Trout Point Group and others will be called to account in the United States Court system for their numerous violations of the United States DMCA takedown procedures contained in 17 U.S.C. 512.  Torstar's complicity in these abuses of the United States Copyright law cannot be gainsaid.

## CONCLUSION

Defendant's Motion to Dismiss under Fed. Rules Civ. Proc. 12(b)(2) and 12(b)(6) should be denied.

Respectfully submitted this 10th day of July, 2015,

_____
Douglas Handshoe, Pro Se
Post Office Box 788
Wiggins, MS 39577
(601) 928-5380
earning04@gmail.com

## CERTIFICATE OF SERVICE

I, Douglas Handshoe, hereby certify that on July 10, 2015 the foregoing was sent for electronically filing by me via the Clerk of the Court using the ECF system which sent notification of such filing to the following ECF participants:

Robert C. Galloway, Esq. (MSB #4388)
Luther T. Munford, Esq (MSB #3653)
Meta C. Danzey, Esq. (MSB #103251)
Butler Snow LLP
Post Office Drawer 4248
Gulfport, MS 39502
Phone: (228) 864-1170
Fax: (228) 868-1531
bob.galloway@butlersnow.com
meta.danzey@butlersnow.com
luther.munford@butlersnow.com

Attorneys for Torstar Corporation and Peter Edwards

Respectfully submitted this 10th day of July, 2015,


Douglas Handshoe, Pro Se
Post Office Box 788
Wiggins, MS 39577
(601) 928-5380
earning04@gmail.com